Cite as 2021 Ark. App. 473

# ARKANSAS COURT OF APPEALS

DIVISIONS III & IV
No. CV-20-475

|  |  |
|---|---|
| SAMANTHA ANN SKELTON (NOW FRYE)<br><br>APPELLANT<br><br>V.<br><br>COLTON SCOTT DAVIS; SCOTT AND SHERI DAVIS; AND JOSHUA COLE FRYE<br><br>APPELLEES | **Opinion Delivered** December 1, 2021<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NOS. 72DR-14-2043; 72DR-19-395; & 72PR-18-907]<br><br>HONORABLE CRISTI BEAUMONT, JUDGE<br><br>AFFIRMED IN PART; REVERSED IN PART |

## LARRY D. VAUGHT, Judge

This case involves a young girl named R.F., who was approximately six years old during the legal proceedings giving rise to this appeal. Her mother, Samantha Frye, and stepfather (now adoptive father), Josh Frye, appeal the Washington County Circuit Court's order granting Sheri and Scott Davis (the parents of Colton Davis, who is R.F.'s biological father) grandparent visitation. Samantha and Josh also contend that it was erroneous for the court to allow the Davises to intervene in the adoption case in which Josh Frye successfully petitioned to adopt R.F. Colton Davis and Sheri and Scott Davis have cross-appealed the court's order granting Josh's petition to adopt R.F. and terminating Colton's parental rights.

We affirm the adoption because there was sufficient evidence that Colton's consent was not required and that the adoption was in R.F.'s best interest. We must reverse the court's orders allowing the grandparents to intervene and providing for grandparent visitation because

the adoption severed the Davises' familial relationship with R.F., and they no longer qualify as grandparents for the purposes of enforcing visitation.

This appeal involves three consolidated cases. R.F. was born on February 6, 2013, to Colton Davis and Samantha Skelton (now Frye). The couple was never married, and they separated soon after R.F.'s birth. Sheri and Scott Davis are Colton's parents. They exercised regular visitation with R.F. after Colton and Samantha separated. In fact, Samantha coordinated alternate weekend visitation with the Davises.

The first case, *Colton Davis v. Samantha Ann Skelton*, case No. 72DR-14-2043 (pet. filed Dec. 11, 2014), began in 2014 with Colton Davis's petition to establish paternity. On May 1, 2015, the circuit court entered an agreed order of paternity with the parties agreeing that Samantha would have primary custody of R.F. subject to Colton's visitation. The court also ordered Colton to pay child support. On November 29, 2016, Samantha filed an emergency motion to suspend Colton's visitation privileges, alleging that Colton had been arrested for possession of a controlled substance, among other offenses. On December 15, 2016, the circuit court entered an agreed order pursuant to which Colton agreed to submit to an observed-collection drug test upon Samantha's request if she had a good-faith belief that he was under the influence of drugs or alcohol during her interactions with him. In May 2017, Samantha requested that Colton submit to a drug test. He tested positive for marijuana, and Samantha terminated all visitation between Colton and R.F.

On August 15, 2017, Colton filed a petition to reestablish visitation after taking a second drug test and testing negative for controlled substances. Samantha responded that the drug test taken by Colton was unobserved and therefore did not meet the requirements of the

December 15, 2016, agreed order. Colton subsequently asked that his petition be voluntarily dismissed, and the dismissal order was entered on October 30, 2017.

The second case, *In re Adoption of* [R.F.]*, a Minor*, case No. 72PR-18-907, began on November 1, 2018, with a petition for adoption filed by Samantha's husband, Josh Frye. On November 13, Colton filed a second petition to reestablish visitation with R.F. An order consolidating the two cases was entered on November 14. On November 20, the Davises filed a motion seeking leave to intervene, and on March 7, 2019, the Davises filed a petition to establish visitation rights as paternal grandparents. On May 16, the circuit court entered an order granting the Davises' motion to intervene in the adoption case, and on May 24, the Davises filed a "Petition for Intervention to Establish Visitation Rights for Paternal Grandparents."

Finally, the third case, *Scott and Sheri Davis v. Samantha Ann Skelton and Colton Davis*, case No. 72DR-19-395 (pet. filed Mar. 7, 2019), began in 2019 when the Davises filed a petition to establish grandparent visitation rights to R.F.

All three cases were consolidated and heard together.

The circuit court held a final hearing on August 30, 2019, to address both the adoption petition and the Davises' request for grandparent visitation. The evidence revealed that while Colton and the Davises had exercised visitation with R.F. early in her life and had, in fact, formed a bond with her at that point, their contact with her essentially ceased after Colton was arrested and his visitation was terminated. Samantha testified that Sheri had not been honest with her about Colton's drug use and arrest. Samantha testified that from October 2017 to November 2018, Colton did not make any effort to have any contact with R.F.

3

Samantha also testified that she sometimes ignored text messages from the Davises but that they had texted her only five times in twenty-eight months and that they had requested contact with R.F. in only two of those text messages. It is undisputed that neither Colton nor the Davises attended R.F.'s school events, such as her kindergarten graduation ceremony, and Samantha testified that Colton had not contacted her by phone, text message, email, or any other form of communication since May 2017. The record also showed that while Colton initially made a legal effort to resume visitation, he abandoned that pursuit nearly two years before the adoption hearing when he learned that he would be required to take a drug test and pay attorney's fees. Since that time, he made no effort to communicate with R.F. or be a part of her life. He admitted in his testimony that he missed three of R.F.'s birthdays and had not sent cards or gifts and that his complete lack of a relationship with R.F. was his own fault, not Samantha's.

Likewise, the evidence at the hearing demonstrated that the Davises had not had significant contact with R.F. in the two years leading up to the adoption hearing. While they did provide some financial assistance for R.F., they did not seek to establish visitation, and they did not spend time with her. There was also evidence that Colton lived with the Davises and that they wanted to help Colton maintain a relationship with R.F.

In contrast, there was testimony that Josh has formed a very close bond with R.F. By all accounts, he has had a hands-on role in caring for R.F. daily for the four years prior to the hearing, she calls him "dad," and she has a happy and stable home life with Samantha and Josh.

Dana Watson, the attorney ad litem, recommended that the court grant the adoption petition and deny the Davises' petition for grandparent visitation.

On November 6, 2019, the circuit court announced a ruling from the bench. Specifically, the circuit court granted the Davises' petition for grandparent visitation and ordered that they be awarded visitation with R.F. on the first and third weekends of every month. In addition, the circuit court granted the petition for adoption, finding that Colton's consent to the adoption was not required because he had failed significantly without justifiable cause to communicate with R.F. for more than a year.

The circuit court then formalized its ruling by entering a series of written orders. On November 15, the circuit court entered an order denying Colton's petition to reestablish visitation. On December 11, the circuit court entered an order granting the Davises' petition for grandparent visitation and also entered a final decree of adoption in which it found that Colton's consent to the adoption was not required and that the adoption was in R.F.'s best interest because Josh was the only father figure R.F. has ever known.

On January 10, 2020, Samantha filed notices of appeal in each of the three cases. On January 17, the Davises cross-appealed the adoption order, and on January 21, Colton cross-appealed all three orders.

On appeal, Colton argues that the court erred in determining that his consent was not required for Josh to adopt R.F. The court found that Colton's consent was not required due to his failure to communicate with R.F. for at least a year. We have previously held that a circuit court's decision regarding parental consent to adopt a child will not be reversed unless it is clearly erroneous. *Newkirk v. Hankins*, 2016 Ark. App. 186, 486 S.W.3d 827. In affirming

5

a circuit court's finding that consent was not needed in an adoption, the *Newkirk* court specifically held that a "circuit court's finding that consent is unnecessary due to a failure to support or communicate with the child will not be reversed unless clearly erroneous." *Id.* at 8, 486 S.W.3d at 832 (citing *Courtney v. Ward*, 2012 Ark. App. 148, 391 S.W.3d 686). A failure to communicate is specifically defined by statute:

> (a) Consent to adoption is not required of:

> (2) a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree . . . .

Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2020).

In this case, Samantha testified that from October 2017 to November 2018, Colton did not make any effort to have contact with R.F., who was five years old at the time. On appeal, Colton attempts to place blame for his failure to communicate with R.F. on Samantha by pointing to brief testimony in which she admitted that she sometimes ignored text messages from the Davises. This argument has no merit. First, we note that Samantha's testimony concerned communications sent by the Davises, not Colton, and pursuant to the statute, the relevant inquiry is whether the "parent" has failed to communicate with or provide care for the child. Ark. Code Ann. § 9-9-207(a)(2)(i). The circuit court correctly found that Colton's complete lack of communication with R.F. was due to his own inaction. Therefore, we affirm the court's determination that Colton's consent to the adoption was not required because he failed, without justifiable cause, to communicate with R.F. for more than a year.

Colton also argues that the court erred in finding that Josh's adoption of R.F. was in R.F.'s best interest. Specifically, he argues that the court failed to consider the bond he had

6

with R.F. and the negative impact that the adoption would have on R.F.'s relationship with the Davises and Colton's extended family. We review the evidence de novo. *Kohler v. Croney*, 2020 Ark. App. 289, at 6, 602 S.W.3d 123, 127. We will not reverse a circuit court's decision regarding the best interest of a child to be adopted unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witnesses. *Id.* We give great weight to a circuit court's personal observations when the welfare of young children is involved. *Id.*

Here, we affirm the circuit court's best-interest finding because there was ample evidence to support it. The evidence demonstrated that Josh is a loving and devoted stepfather who has been a stable and consistent part of R.F.'s daily life for four years. R.F. calls Josh her dad, and he has filled that role in every way. The attorney ad litem recommended that the court grant the adoption petition, noting that Colton had chosen to use drugs, dismiss his petition to reestablish visitation, and abdicate his parenting duties, but that,

> [f]ortunately for R.F., Joshua Frye has stepped up and stepped into the role as a father and a daddy to this little girl. He's coached her T-ball team. He's been to her school to have lunch with her. Colton didn't even know where she was going to school, he said. He's participated in her events at school. Birthday parties. Christmases that Colton missed. [Colton] missed because of his poor choices. I believe it is in the best interest of R.F. to allow the stepparent adoption to be finalized and to be granted, and that Joshua Frye formally made to be her father.

The ad litem went on to note that the Davises had been "out of her life for 28 months," and "there is no relationship there anymore." Given this evidence, the court found that Josh is the only father figure that R.F. knows and that it was in her best interest to grant the adoption.

In *In re Adoption of AP*, 2021 Ark. App. 440, 638 S.W.3d 293, we recently rejected a similar challenge by a biological father who argued that an adoption would not be in the child's

7

best interest because it would terminate the long-term relationship between the child and his paternal grandparents. We reiterated that "it is for the circuit court to weigh the benefits flowing to children from the granting of an adoption, as opposed to disadvantages which may result from the severing of ties between grandparents and grandchildren." Citing *Newkirk v. Hankins*, the *AP* court explained that a circuit court evaluating whether adoption is in a child's best interest is not required to prioritize "relatives' [want of] a relationship with the child over the child's need for a stable and permanent home." *Id.* at 16, 638 S.W.3d at 303 (citing 2016 Ark. App. 186, 486 S.W.3d 827). We therefore find no reversible error as to the court's best-interest finding.

Next, Josh and Samantha appeal the court's order allowing the Davises to intervene in the adoption case. In a similar case, the Arkansas Supreme Court explained:

> It is clear that under § 9-9-912(g), the Johnsons had a right to notice of the adoption proceedings. And they received the required notice. But the statute does not grant to grandparents a right to intervene or a right to be heard in adoption proceedings. Under a strict construction analysis, we have no doubt that had the General Assembly intended to include a right to be heard by notified grandparents, it could easily have done so.

*In re Adoption of Tompkins*, 341 Ark. 949, 951, 20 S.W.3d 385, 386 (2000). The statute referenced in *Tompkins* is Arkansas Code Annotated section 9-9-212(f) (Repl. 2020), which provides a single circumstance when grandparents are entitled to notice of an adoption—when one of the parents is deceased. It does not apply where, as here, both biological parents are alive. *See also Henry v. Buchanan*, 364 Ark. 485, 221 S.W.3d 346 (2006) (affirming denial of grandparents' motion to vacate adoption decree, noting the other exception—when grandparents stand in loco parentis—which was not the case here). Additionally, there is no right to intervention where there is a right to file a separate action. *Milberg, Weiss, Bershad, Hynes & Lerach, LLP v.*

*State*, 342 Ark. 303, 315, 28 S.W.3d 842, 850 (2000) (if "[a] party seeking intervention will be left with the right to pursue an independent remedy against the parties in the primary proceeding, regardless of the outcome of the pending case, then the party has no interest that needs protecting by intervention of right"). Here, the Davises availed themselves of their right to be heard by filing a separate action for grandparent visitation under Arkansas Code Annotated section 9-13-103 (Repl. 2020). Therefore, we hold that the Davises had no statutory right to intervene in the adoption proceedings, and the circuit court's order granting the intervention was erroneous.[1]

Josh and Samantha also argue that it was reversible error for the circuit court to award the Davises grandparent visitation, given that the adoption effectively severed the Davises' relationship with R.F. They also argue that granting the Davises' petition for grandparent visitation was not in R.F.'s best interest.

We reverse the circuit court's order granting the Davises' petition for grandparent visitation because our case law is exceedingly clear that Josh's adoption of R.F. severed Colton's parental rights and therefore also terminated the Davises' legal status as grandparents, making the grandparent-visitation statute, Arkansas Code Annotated section 9-13-103, inapplicable. The Arkansas Supreme Court has repeatedly reviewed the controlling law on grandparent visitation and determined that adoption severs the grandparent-grandchild relationship. *Scudder v. Ramsey*, 2013 Ark. 115, at 9, 426 S.W.3d 427, 433 ("This court has made

---

[1]We note, however, that given the consolidation of all three cases—including the Davises' separate case seeking grandparent visitation—and the fact that the circuit court heard the adoption and visitation issues together, the error in allowing the Davises to intervene in the adoption case did not fundamentally affect the outcome of the issues now on appeal.

clear that a grandparent's rights are derivative of his or her son's or daughter's parental rights." (citing *Suster v. Ark. Dep't of Hum. Servs.*, 314 Ark. 92, 858 S.W.2d 122 (1993); *Henry*, 364 Ark. 485, 221 S.W.3d 346); *Vice v. Andrews*, 328 Ark. 573, 945 S.W.2d 914 (1997).

In *Vice*, the supreme court reviewed a situation in which paternal grandparents sought court-ordered visitation rights after their son's parental rights had been terminated. 328 Ark. 573, 945 S.W.2d 914. The court explained,

> The public policy regarding this issue has been established by legislation. The laws relating to adoption are derived from statutes; and at common law, a grandparent could not maintain an action for visitation rights to a grandchild except as a party to a custody proceeding. *Reed v. Glover*, 319 Ark. 16, 889 S.W.2d 729 (1994) (citing *Quarles v. French*, 272 Ark. 51, 611 S.W.2d 757 (1981)). We have often relied on our rule that any right that a grandparent possesses must be either derived from statutes or conferred by a court of competent jurisdiction pursuant to statute. *Id.* at 19, 889 S.W.2d at 730 (citing *Cox v. Stayton*, 273 Ark. 298, 619 S.W.2d 617 (1981)).
>
> In recent years, Arkansas statutory law has become more liberal in establishing grandparents' rights. In 1975, the legislature provided for grandparent visitation in the event of divorce or custody proceedings. Ark. Stat. Ann. § 34-1211.1 (Supp. 1983). A later amendment enacted a very broad standard for grandparent visitation and allowed visitation to a grandparent "regardless of the marital status of the parents of the child or the relationship of the grandparents to the person having custody of the child." Ark. Stat. Ann. § 34-1211.2 (Supp. 1985). In 1987, the legislature again revised this area of statutory law and granted courts permissive authority to allow grandparents visitation in situations where the "relationship between the parents of the child has been severed by death, divorce, or legal separation." Ark. Code Ann. § 9-13-103(a)(1)(A) (Supp. 1995).

*Vice*, 328 Ark. at 575–76, 945 S.W.2d at 915. However, the court went on to state that "[b]ecause all legal relationships terminate once a child is adopted, *a biological grandparent is no longer legally entitled to visitation privileges*." *Id.* at 577, 945 S.W.2d at 915 (emphasis added). This is because public policy favors the rights of the adoptive family once adoption has occurred. "Except with respect to the adopting parent's spouse and his or her relatives, the effect of the final decree of adoption is to 'terminate all legal relationships between the adopted individual

and his natural relatives, including his natural parents, so that the adopted individual thereafter is a stranger to his former relatives for all purposes.'" *Id.* at 576, 945 S.W.2d at 915 (citing Ark. Code Ann. § 9-9-215(a)(1) (Supp. 1995)).

In the present case, both the attorney ad litem and R.F.'s parents concluded that denying grandparent visitation was in R.F.'s best interest given the Davises' desire to foster an ongoing relationship between Colton and R.F. and their role in hiding Colton's drug use and arrest from Samantha. Because Arkansas Code Annotated section 9-13-103 is inapplicable to the Davises, who are no longer legally R.F.'s grandparents, the statute provided the circuit court no authority to override Samantha and Josh's decision, as the child's parents, to deny such visitation. Accordingly, we reverse the circuit court's order granting the Davises visitation.

Affirmed in part; reversed in part.

WHITEAKER, HIXSON, and BROWN, JJ., agree.

MURPHY, J., concurs in part and dissents in part.

BARRETT, J., dissents.

**MIKE MURPHY, Judge, concurring in part and dissenting in part**. The majority is correct that the adoption severs the grandparent-visitation rights. My issue lies with the fact that in attempting to craft a remedy that cannot exist, the court undermined its own best-interest finding for purposes of the adoption.

In *Ballard v. Howard*, 2018 Ark. App. 479, 560 S.W.3d 800, a husband filed a petition to adopt his wife's son, which the biological father contested. The lower court denied the adoption petition in light of the significant relationship between the child and the child's

paternal family. We affirmed the denial and noted that it is acceptable to consider the relationship between the children and the extended family of the parent whose rights would be terminated by an adoption as part of a best-interest analysis. *See also In re Adoption of J.P.*, 2011 Ark. 535, at 19, 385 S.W.3d 266, 278; *Hollis v. Hollis*, 2015 Ark. App. 441, at 10, 468 S.W.3d 316 (affirming trial court order that considered relationship between the child and child's extend family as part of a best-interest analysis).

Here, by trying to grant both the adoption and the grandparent visitation, the circuit court muddied its own best-interest findings enough that I think the safer approach, especially considering the gravity of the subject matter, would be to reverse and remand both the adoption and the grandparent-visitation issue with instructions for the trial court to weigh the evidence and make findings knowing now that it may not have its originally intended remedy.

For these reasons, I would reverse and remand the adoption. I concur with the majority that the order granting grandparent visitation should be reversed, but I would remand it as well.

**STEPHANIE POTTER BARRETT, Judge, dissenting**. Would the circuit court have found the stepparent adoption in the best interest of the child knowing it would sever the paternal-grandparent relationship—which the circuit court found was a significant and viable relationship —and that the loss of that relationship is likely to harm the child? A remand for further findings is the only way in which to find the answer. As pointed out by the majority, "it is for the circuit court to weigh the benefits flowing to children from the granting of adoption, as opposed to disadvantages which may result from the severing of ties between grandparents and grandchildren." *In re Adoption of AP*, 2021 Ark. App. 440, 638 S.W.3d 293. I

believe the majority has stripped from the circuit court the ability to make this determination. I would agree with the majority that the circuit court's findings are inconsistent and require reversal; however, I would reverse and remand the adoption and grandparent-visitation issues for further factual findings by the circuit court regarding the best interest of the child. Further, I would reverse the finding that the father's consent was not required. In that regard, I respectfully dissent from the majority.

The circuit court found Mr. Davis's consent was not required because he "failed significantly, without justifiable cause, to communicate with the child for more than a year's period of time." This determination was made despite the fact that Mrs. Frye obtained a court order disallowing Mr. Davis's visitation with R.F. following a failed drug test.

By Mrs. Frye's own testimony, she purposely kept R.F. from Mr. Davis and admitted refusing visitation and contact with the grandparents solely to prevent Mr. Davis from having contact with R.F. A party should not be allowed to prevent visitation and then use that lack of visitation as a weapon to file for adoption and deprive another under the lack-of-consent requirement. For that reason, it is my position that the circuit court clearly erred in finding that Mr. Davis's consent was not required in that following a court order preventing visitation with your child is justifiable cause for a failure to communicate. I would reverse the finding that Mr. Davis's consent to R.F.'s adoption was not required.

The circuit court went into lengthy detail regarding its finding of a significant and viable relationship between R.F. and her grandparents and why grandparent visitation is in R.F.'s best interest. Specifically, the circuit court found it would be harmful to R.F. if that relationship were severed. The finding of a significant and viable relationship with extended family

13

members such as paternal grandparents must be done before the best-interest analysis for an adoption can begin because a finding of a significant relationship is inherent to that determination. The circuit court cannot find that adoption is in R.F.'s best interest and also find that maintaining the significant relationship with the Davises is in her best interest. These two conclusions cannot coexist under our state's laws. Many times, this court has held that a finding of a significant relationship like the one in this case precludes adoption because adoption would sever any ties between the adopted child and the extended biological family, and that cannot be in the best interest of a child when a significant relationship has already been established. *Ballard v. Howard*, 2018 Ark. App. 479, 560 S.W.3d 800; *In re Adoption of J.P.*, 2011 Ark. 535, 385 S.W.3d 266; *Hollis v. Hollis*, 2015 Ark. App. 441, 468 S.W.3d 316.

The circuit court, in making the determination that adoption was in R.F.'s best interest, was operating under the false understanding that grandparent visitation could also be in the child's best interest. The majority is stripping the circuit court of the ability to weigh the benefits of adoption against the disadvantages of severing the grandparent relationship even though the circuit court's orally recited findings of fact in this case weigh heavily in favor of grandparent visitation as outweighing the benefits of adoption. The only facts found in favor of adoption were that Josh Frye "has been in her life for the past four years. They've lived together for two years. She calls him Dad. He is her dad in every respect, except biologically. He coaches her t-ball team. So, I do find that it is in her best interest for stability and for the consistency for the step-parent adoption to occur." A person married to the custodial parent of a child will always stand in the same position as Mr. Frye regarding children living in the same household. A stepparent has the privilege of consistently being around the child thereby

14

providing stability, while the noncustodial parent is usually only allowed every other weekend visitation—but in this case, no visitation at all—by court order. I believe the circuit court's cited facts and the majority's reliance on that position would favor stepparent adoption over a biological parent and the extended family that flows from them almost every time. For that reason, I would reverse and remand the adoption and the grant of grandparent visitation to the circuit court for further findings regarding the best interest of the child in light of the fact that adoption and grandparent visitation cannot coexist under law. I would also reverse the finding that Colton Davis's consent was not required.

I dissent.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellant/cross-appellee.

*Lancaster Law Firm, PLLC*, by: *Clinton W. Lancaster*, for separate appellees/cross-appellants Scott Davis and Sherri Davis.

*Taylor & Taylor Law Firm, P.A.*, by: *Jennifer Williams Flinn*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for separate appellee/cross-appellant Colton Davis.